3091 which is the Community Landfill Company et al. Appellants are Mark A. LaRose v. Illinois Pollution Control Board et al. athletes and Laura Lundin. Mr. LaRose. Good morning, counsel. May it please the court. Again, my name is Mark LaRose and I represent the appellants, Community Landfill Company, I'll call that CLC, and Edward and Robert Prime. From time to time I'll refer to them collectively as the Primes. The primary issue in this appeal is whether or not the Pollution Control Board erred in finding personal liability of the Primes for eight counts of violations of the Illinois Environmental Protection Act. This court in 1995 set the standard in the case of state versus CJR processing for personal liability of corporate officers. And that standard is personal involvement or active participation in the violations. Since then, in the last 16 years, there's only been two other pronouncements by Illinois appellate courts on the issue. People v. Tang and People v. Agpro. A third court, interpreting the Oil and Gas Act, adopted this court standard and relied on CJR processing, Tang and Agpro, in making its decision. What this court does today will definitely have an impact on the law of personal liability of corporate officers under the Act. That's because if the Board's affirmed, this will be the first time that a court has held that officers could be held liable for the Act where they didn't actively participate in the operation of the site, day-to-day operation, or actively cause the violations. Because the linchpin in all of the cases has been, and the common thread, is whether the corporate officers ran the site or actively participated in the violations. For example, in CJR, this court found personal liability against a corporate officer because he ran the site and because he caused the violations. In Tang, the court found no personal liability because Cyrus Tang didn't operate the site and didn't cause the violations. In Agpro, the corporate officer was found personally liable because he ran the site and applied the offensive chemicals to the land. In Petco, the corporate officer was not personally liable because he didn't exercise day-to-day control of the facility. How many of our orders were reversals or affirmances of the Board's decision in those cases? In your case, it was an affirmance of the circuit court in CJR, and it was based on a 619 standard because it was whether the complaint alleged enough. In Tang, again, it was a reversal. Excuse me, it was an affirmance of the circuit court's finding of no liability, again, on a 619 standard. In Agpro, that was the only case under the acts, besides this one, where there was actually an evidentiary hearing. I believe the court in Agpro and Agpro was, hold on one second, Agpro was a second district case in 2004, and the Agpro court upheld the trial court finding. When you say trial court, are you talking about police control court? Nope, I'm talking about the circuit court. I don't think any of these were PCB cases. Right. They were all circuit court cases because the AG has the discretion to bring cases either under the police control board or under the act. And I want to point, I think you make an important distinction. The trial court in these cases actually got to hear the evidence. The police control board heard nothing. I pointed that out in my reply brief. Even though they were entitled to and encouraged to attend, not one of the seven board members attended any part of this hearing in this important case that had been pending for 14 years. I think that's important because they're in no better position to judge the credibility of the witnesses than your honors are. They just read the transcript. The fellow that sat at the hearing for three days and did a fine job, by the way, he made the finding, as is his responsibility, that there was no credibility issue. So when Edward and Robert Prime say we didn't do this, when Edward Prime says I didn't have any idea about the override of the landfill, when Robert Prime says I disputed the certifications, that's uncontradicted evidence. It's credible. And any finding by the board questioning those findings, I think you can ignore them. With respect to the board's findings, it's important that the board found in favor of the primes and five counts of personal liability. Just quickly, primes were exonerated on failure to manage refuge and litter, failure to prevent leachate flow. That's an important one. We'll talk about it in a minute. Failure to properly dispose of landfill waste. Threatening or causing water pollution, also important. We'll talk about that in a minute. Improper disposal of waste tires. The board found, and I'll quote from appendix 51, which is page 41 of the board's order. The evidence, quote, the evidence in the record indicates that Mr. Pallmarsh, he was the guy who ran the site, made the day-to-day site management decisions. The primes were in an office some 60 miles away, and the record contains no evidence that the primes directed the day-to-day operations at the site. Despite this holding, that they didn't do anything at the site on a day-to-day basis, they were found liable of eight violations. Four of them relate to overhype. Two of them relate to financial assurance. One of them relates to failure to file a significant modification application. And finally, one relates to revised cost estimates. Excuse me one second. There is more at stake than just this case. I'll point out three examples. It's a pending case in Grunning County before Judge Marsalia. The case is by the city of Morris against CLC and the primes. Even though the standard against the primes is completely different, it's an alter ego, pierce the corporate veil standard. The city of Morris has been flag-waving the police control board's order as if it's some signal to Judge Marsalia that, well, if the police control board finds him liable, if the appellate court finds him liable, then who are you to decide otherwise? And that case is worth several million dollars. Moreover, the same permits and certifications that the board found the primes liable for signing were signed by two mayors of the city of Morris, Washburn and Feeney, and three licensed professional engineers, Andrews, McDermott, and Madonia. If the primes are liable because they signed those same certifications, then are we telling the mayors of Illinois and the engineers of Illinois that if they sign these things, they could be liable too because they made the same certifications that the primes did? Finally, it's kind of current with Illinois fighting to keep corporations and businesses and jobs in Illinois who are threatening to move out because of a poor economic climate. Are we going to tell corporate officers if they sign a permit application, if they sign a certification, if they subject themselves to personal liability under the act? Let's talk about the override violation because I think that's probably the most significant one and it covers four of the counts. The allegation was that the landfill was filled above its permitted capacity of 580 feet above sea level. The only evidence cited by the board, it appears in appendix 58, was the primes signed landfill certifications that indicate landfill capacity certifications that indicated that there was no space left in the landfill, yet they continued to accept waste. And the finding of the board that only the primes could stop accepting waste at the landfill. That's it. That's the entirety of the evidence against them. Every one of the five witnesses presented by the state stated that they had absolutely no evidence of personal involvement or active participation of the primes in any of the allegations. And Jim Pellenaar, the guy who ran the site, said, I decided where, when, and how to place the waste and nobody, including the primes, told me to place it above 580. Let's look at the certifications because they're important. They appear in our appendix, one of them at 82, one of them at 86, and one of them at 91. Indeed, Edward Prime and Robert Prime, respectively, signed 1995 and 1996 landfill certifications that indicated little or no available capacity, but they accepted the waste. Can I interrupt you? Sure. Because I want to understand something, or try to. When the landfills, as you said, when it's full, up to capacity, was there any place to put the refuse in that landfill that wasn't above 580? Yes and no. Up to 1996, no. I would say yes. Before 1996, even if the landfill was a little high, and I'm not conceiving that it was, there was areas on the sides of the landfill where there was capacity. After 1996, remember, there's two sides to this landfill. The west side of Ashley Road is parcel B, 55 acres. The east side of Ashley Road is parcel A, 55 acres. In 1996, we received from both the city and the state the ability to reopen parcel A. So as of 1996, A was open, there was plenty of capacity. As of before 1996, we assert that even if B was a little bit high, then there was room on the sides of the landfill to put waste. So the answer is yes. Did I answer your question? Sort of. Yes and no. Touche. The same landfill certifications that the Prime signed, as I said before, were signed by the mayors and the engineers. The document says absolutely nothing about 580 feet above sea level, and it's not really an exact science. You've got to remember what the purpose of this certification is. The government uses it to prepare a report that says how much capacity does Illinois as a whole have in landfill capacity. So it's not like we're measuring this thing to the exact cubic yard. And also, there's no way anybody could look at that form or walk around the landfill or drive around the landfill and determine whether it was over height. Remember, parcel B is 55 acres, six stories high. You can't even see the top of the landfill from the ground. How could these guys possibly know from 60 miles away that it was 582 feet above sea level or whatever? How did the state prove it? The state proved it through an aerial survey that was submitted by my guys, my own guys, in a 2,000 permit application where they identified the potential for an over height by 10 feet. In other words, the only active participation or personal involvement was when they were notified by the state. They went out and did a survey, found out that it was 10 feet high, and the record indicates they ordered Jim Pelnarch to start removing waste off the top. So their active participation was to help solve the problem, not to help create it. I know I only have a minute left, and I'll speak to you again for a few minutes in rebuttal. But the most important exculpatory evidence that the board ignored on the over height was Bob Prime's testimony that he disputed his engineer in the 96 certification. And the engineer said, you're right, there are discrepancies. We'll fix them. In 1997, they did fix them. In 1997, the certification identified 1.7 million cubic yards of waste that was in both parcel A and parcel B. The state says, you know, that's good for us. I don't know why it's good for them. I think it's bad for them. Because if, in fact, that there was no capacity left in parcel B, the certification would have said 1.7 in A only. It said 1.7 in A and B. Quickly about the penalty. Primes are guilty of eight violations. CLC is guilty of 17. Across the board, $250,000 penalty that seemed to be come out of thin air. How could it possibly be reasonable to have the same penalty for the primes in CLC? So in closing, I'd like to ask you respectfully to reverse the board in finding a personal liability, send it back to them for reassessment of the penalty. And I would like to reserve some time for rebuttal, please. Thank you. Thank you, Mr. LaRose. Thank you, Your Honor. Ms. Wonder. Good morning, members. On behalf of the people on the board, we believe that the board's decision should be affirmed because it's solidly supported by this court's decision in CJR processing. And I think it's, excuse me, sorry. It's worth keeping in mind at the outset that this is against the manifest way to the evidence standard, which is, of course, very deferential. And that requires affirmance unless the board's decision is plainly unreasonable. And on the merits, what the court did here was to apply the corporate officer liability standard that was established by this court in CJR. I mean, counsel suggests that the prime's reliable because they're corporate officers or because they signed forms, suggesting this is an expansion into new territory. But that's not correct, and none of that reflects what happened in this case. Here, the board looked to the CJR standard, and that's a case that instructs that a corporate officer can't hide behind a corporate form. They're liable when they're personally involved or actively participating in the decisions and the corporate activities that cause the violations of the act. And the court looked very carefully at the specific facts of this case and the specific violations that were alleged. And so for some of those violations, for the day-to-day operating violations, the board determined that the primes were not liable because they were not at the site making those types of day-to-day decisions that related to those violations. But for some of the violations, the board found that the primes were liable. Those related to Parcel B becoming overfilled, the failure to timely file financial assurance, misrelated cost estimate, and the failure to timely file the SIGMOD permit. And that's because in each of those areas, the primes made those decisions that caused those violations, that controlled the actions that were the substance of those violations. What's the evidence on the capacity of the landfill? With respect to the overhead? That seems to be operational. There the evidence was that it wasn't day-to-day. The evidence there was that the primes knew that there was no more space available in Parcel B, and they nonetheless continued to accept waste into Parcel B instead of shutting it down when it had become full. And only they, and no one besides they, could make the decision to stop accepting waste at Parcel B. And the liability isn't because they signed landfill capacity forms. Cuts will suggest that, well, mayors signed the forms and engineers signed the forms. Well, engineers and mayors don't make the decision to shut down the landfill. Well, only the primes could do that, apart from some type of regulatory action. But other than that, that was really within their control. And Mr. Pelnar said that the site manager, Mr. Pelnar, said that he didn't make that type of decision. Only the primes did. So the significance of the landfill capacity certification forms is that it is evidence that the primes were aware through these representations that the landfill had become full. Now, because those forms show that as of January 1995, you start out with zero capacity. And during that year, 540,000 cubic yards of waste was taken in. So waste is being taken in after the landfill has become full. And there are other documents submitted by the primes and CLC also demonstrating the over-height. The survey that was part of the SIGMOD application that shows that the parcel had become over-height. And an addendum to that in 1997, where the engineers are making the representations. Yeah, this is over-height by 475,000 cubic yards, and it's going to cost us $950,000 to move it. So this is all evidence that the primes knew that this landfill had become over-filled, and were continuing to take in waste. And so they're liable because knowing that the landfill is full and continuing to take in waste is what establishes those particular violations. They were involved in participating in those particular violations, and that establishes their liability. Counselors suggested they bring up in their reply brief this idea that a board member didn't actually attend the hearing and suggest from there that the hearing officer's report states that he saw no issues of credibility and they suggest from there that that's some type of a credibility finding that is binding on the board. And that's incorrect as a matter of law, and it's also really not relevant here. It's incorrect as a matter of law because it is the board's decision that, it was the board's role under the Act to evaluate and weigh all of the evidence, and it's the board's decision that is under review, and the board's decision that's reviewed under and against the manifest way of the evidence standard. And that's well established, and that's established and applicable regardless of whether a board member attended the hearing. And the Act addresses this. Section 33A of the Act provides that the board is to consider the evidence and to supply a written decision, and the hearing officer does not have a role in making the decision, and there's no requirement in the Act that a board member actually attend. So what we're looking at is the board's evaluation of all of the evidence and whether the board's evaluation of the evidence was against the manifest way. Now, there's really a more basic point here, which is that credibility really isn't an issue because, well, certainly credibility doesn't mean, the primes got out of the stand and said, we believe we're not liable, and therefore the board had to believe them and they had to win the case, and credibility doesn't mean that. But what the primes said was, well, we believe, and I'm still talking about the over-height violations, we believe that, yeah, we saw that this had zero capacity, but we think that there was additional capacity in Parcel B, and we think that this additional capacity is where the buildings are. That's irrelevant to the current over-height of Parcel B because even if you, and they didn't supply any surveys or anything to suggest that there is any additional capacity in Parcel B after the state had put out evidence to suggest there isn't, including the primes' own documents. But assuming that there was additional capacity in Parcel B where the buildings are, that's not where waste is being placed, so it's irrelevant to the current height of Parcel B. Likewise, they say, well, there was an additional landfill capacity form, we thought there'd be an adjustment. That adjustment is when Parcel A started operating, so now all of a sudden you have 1.7 million cubic yards of capacity, but that's because Parcel A is now included in the calculation. Help me understand this, because we have a Parcel B that you're saying violates the height requirement. Yes. And air value is over capacity, correct? Yes. So across the road we have another landfill site that's a hole, okay? It's not a hole, there's waste there as well. But there's capacity there, right? There is capacity there. And so now you can combine the two to decide that Parcel B is over height? I'm sorry? You cannot combine the figures of both and allow Parcel B that is allegedly over height to remain? You cannot allow Parcel B that's allegedly over height to remain. The violations have to do with the over height in Parcel B. Right. The violation just relates to Parcel B. Okay. Parcel A is across the street. It has different permits. Your statement was that somehow because Parcel A comes online or has capacity. I may not have been clear. What I was trying to explain there is the primes are suggesting we thought there'd be an adjustment to this landfill capacity form. And the adjustment we thought, well, that was on the next form. But when you look at the next form, that was a submission that covered both Parcel B and Parcel A. So when you look at the next form and you see, oh, yes, there's 1.7 million cubic yards of capacity, that's not telling you that there's 1.7 million cubic yards in Parcel B. So it's really not that relevant. And ultimately here, there was evidence. And we have to keep in mind that, I mean, the ultimate, the state's case, the state was operating under a preponderance of the evidence standard, and the board is operating under and against the manifest rate of the evidence standard. So there was plenty of evidence in this record that the primes knew, based on their representations, that Parcel B had no more capacity, and then they continued to take in waste in Parcel B. And that's why they're personally liable, because that was the violation. The violation was letting this landfill become overfilled and continuing to take in waste. Is there a discrete reason for the overheight requirement, or is it only an indicator of the fact or the allegation that it has exceeded capacity? Here I think that they're roughly, that the overheight and the overcapacity go together, because we're talking about up in terms of the waste being placed too high vertically. And I think the best way to think about it is that it had become full. So if it's too high, but there's still space on the sides, assuming that there's still space on the sides, does the overheight in and of itself constitute a violation? Yes, because it is outside the permitted boundaries of the landfill. If there was some permitted room in an area where the building was, that's not where they put the waste. There's a building there. So this is too high based on their survey, based on landfill capacity forms, the SIGMOD application that shows this being too high, and the addendum to the SIGMOD, which says, we have found that there's 475,000 cubic yards of waste, and it's going to cost us $950,000 to move it. I think I have the same confusion that Justice McDade has. Let me see if I can... One normally doesn't measure height in cubic yards, and that's a volume measurement. And so are we talking about the height requirement? Is that an average height allowed on the property, or if anything sticks above that, you're in violation? I think of it as anything above the permitted height, you know, 580 feet above sea level. And the evidence in the record was this is above that height. And again, you know, we're looking at the... ultimately looking at whether facts and all the evidence before the board, whether this was against the manifest weight of the evidence. So there's plenty of evidence there based on all of the submissions, the documents that were submitted to show that the primes were aware of parcel B becoming full and parcel B being above its permitted height. How much above its height was it? Well, that actually is... there's no precise figure for that. The primes documents represent that it is 475,000 cubic yards above the permitted height. See, that's where I'm having trouble. That's a volume measurement, not a height measurement. And that's where I'm...this is throwing me for a loop, and I apologize. We might be in dents, but you measure height usually in inches, meters, you know, yards, feet, whatever, but not in cubic yards. Does that...that's volume, not... Right. Well, you can calculate, arguably, theoretically, volume if you know the height that you cannot go above and the distance from that measurement up, and you arguably could construct a volume measurement. So the addendum did talk in terms of cubic yards, but it also specifically says...the addendum to the Sigma permit that they filed, it also specifically says this is over height, and we're planning to move this to Parcel B in terms of how much it's going to cost. So the violation is over height per se? Pardon me? The violation is permitting the landfill to be over height per se? The excess of the permitted height, yes. Okay. So even if there's room to reduce that height within Parcel B, it's still a violation? Yes, because the parcel is over height. And, in fact, in the... there was some re-judgment on this count to the corporation, to CLC, and they concede that the parcel is over height in the summary judgment motion. So there's no...so based on the evidence there, the submissions, the concession, there's evidence for the board to conclude that the parcel is over height, there's evidence for the board to conclude that the primes were aware of that and continue to take in waste while only they had the authority to stop taking in the waste. And that is what establishes their liability. They did not have to expressly direct the site director to take in waste. When they knew it was over height, they were the only people who could stop it, and they decided not to stop it. That establishes the substance of those violations. Same thing for the financial assurance, the SIGMOD violations. In each case, they acknowledge, we worked in those areas, we were responsible for financial assurance. We were the only people who could get it. Deciding not to get it was the substance of the violation. On timely SIGMOD permit, we did the permitting. We made a decision. We weren't going to get it.  That's the substance of the violation. And because we feel that the court properly applied CJR, we ask the court to apply. All right. Thank you, Ms. Wunder. Mr. Laroche, brief rebuttal. Let me clear up the mystery about the over height. Our engineers did a flyover, and they said it was 590 feet or 10 feet over height. But never, there's nothing in this record where we ever charged with overfilling the landfill, only it being too high. So to answer all three of your questions, we could build a tower of waste 581 feet above sea level, and we would be in technical violation, even though there might be hundreds of thousands of cubic yards. And that's exactly what happened in this case. We didn't have to put it in the garage or in the buildings. When Primes became aware of this, there's no evidence that they knew about it and then said, go ahead and fill it higher. When they became aware of this, they ordered Pelmarsh to knock down the top of the landfill and to take up to 200,000 cubic yards off the top and move it to the bottom. That's exactly what happened in this case. You've got to take a close look at the landfill certifications when you make your decision in this case. It's an absolute quantum leap of logic to say that from signing those certifications that the Primes would know that the landfill was overhyped. I mean, it's just, it's something that no, you know, this wonder couldn't even tell you how overhyped it is. From the settling today, the Primes don't even believe it's overhyped. The figure went from 475,000 cubic yards down to the state's own figure of 60,000 cubic yards above the permitted capacity. It's like a moving target. So to hold them responsible for this, you know, 10 feet overhyped, I'm not saying it's not a serious violation, but to hold them personally responsible. Remember, the corporation, I'm not arguing that they shouldn't be responsible for it. I'm arguing that these gentlemen 60 miles away didn't have knowledge that this thing was overhyped and said, go ahead and make it more overhyped. With respect to the... Mr. LaRose, before you leave that other topic... Go ahead. There was some discussion about an area of contention between the engineer and one of the Primes with regard to whether or not there was additional capacity. Right. Or whether or not... Exactly, whether or not it was additional capacity. Because the 96 certification said that there was zero capacity, but there was... Excuse me one second. 540,000 cubic yards of waste accepted in that previous year. When Bob Prime was asked by Vince Padone to sign that, he said, that's not right. I don't believe that. Because of compassion and other things, you're not reporting this correctly. And he said, don't worry. Just sign this. We'll make the adjustment next year because we're in the flows of this SIGMOD application. Indeed, the next year, 1.7 million cubic yards. Ms. Wonders said it, A and B. It wasn't just A. It was A and B. And the certification said we have 1.7 million cubic yards. It didn't say you got 200,000 in B and 1.5 in A. Admittedly, it was combined. But if there was only capacity in A, then the certification wouldn't have said that. It wouldn't have said A and B. In order to have personal involvement and active participation, is it necessary to have knowledge? Well, I would think so. I mean, if you don't have knowledge of the act, I guess the point is, Justice, this would be the first time. You know, counsel says follow CRJ. But this would be the first time there would be any pronouncement of personal liability if the board's order is upheld without a finding that that person actually operated the site or actively participated in the violation. Like I said, to say that the crimes from 60 miles away in Crestwood knew that this thing was 581 feet or 582 feet or 590 feet until somebody advised them of that and until they took actions to correct it is a quantum leap of logic. And I think when you look at the purpose for the certification to conduct this survey, to use that to find these guys personally liable subjects almost anybody in this state who, if you look at the form, they're required to cite it. It says corporations by a corporate officer at least of the level of vice president.  So when a corporation's involved, I mean, look at the financial assurance. The only evidence was that these guys were involved in financial assurance, guaranteed debts, signed checks. And then the board went on to say because they guaranteed debts, they commingled personal and corporate funds. Come on. There isn't a small, closely held corporation, especially today, but still back in the 80s and 90s, where corporate officers weren't required to guarantee the debts. That doesn't make it any less of a viable corporation, and it certainly doesn't establish personal liability. This isn't commingling. This is doing business. Who do they want to sign the checks? Strangers? I mean, this is a corporate officer. That's who signs the checks, and that's what they found them liable for, for financial assurance. There's another financial assurance case pending before this court set for oral argument for my fifth time now in the CLC cases in the last 15 years next month. In that case, $17 million of financial assurance is at stake. It's been pending for eight years, and the only defendants are the city of Morris and Community Landfill Company. If the Primes aren't responsible for $17 million of financial assurance, why are they responsible here for less than a million? The, oh, stop accepting waste. Only the Primes can stop accepting waste. That's just wrong. Robert Prime correctly testified that the state who regulates the landfill and the city who owns the landfill put orders stopping accepting waste. Yet, in the 14 years that this case has been pending, not a single order, request, demand, complaint that we stop accepting waste. Is that like you didn't arrest me before I robbed the bank? I mean. No, no, but, but the overhype, these documents were filed in 1995. If, in fact, they prove the Primes' personal knowledge is so right, why didn't the state or the city say something? It's not, it's not before I robbed the bank. It's after I allegedly intentionally overfilled the landfill. Why, why didn't they stop? Your Honor, my time's up. I appreciate your attention to this matter, and in due respect, I ask that the, that the court reverse the Pollution Control Board's finding of personal liability against the Primes. I didn't get a chance to address all the other counts, but the overhype and the rest of the counts, and remand to the Pollution Control Board for a reassessment of the penalty. I still have one area of confusion. You mentioned in the first part of your argument that there's a pending case before Judge Marcelli, I think you said, that has to do with piercing the corporate bail. Correct. Why is piercing the corporate bail not something that's involved in this case? What's the difference? Because, because this court established the, a different standard for violations of the Environmental Protection Act. And only the state could bring those either before the board and, and the circuit court. And they said, you don't have to pierce the corporate bail. All you have to do is establish personal involvement or active participation. Now the city, in Judge Marcelli's case, it's the city, remember, not the state of Illinois. There, when they allege breach of contract against us and say that the Primes are personally responsible, they're required to go by the piercing the corporate bail or alter ego theory. That theory, that same theory, because it's not, they're not alleging abolishing the act. They're alleging that we breached our lease with them. But, nonetheless, they're waving the Pollution Control Board flag before Judge Marcelli, who, now I have to switch, you know, switch his thinking around and say, Judge, it's a different standard. And it's kind of hard to, to, it's kind of confusing. But, but this, this court set the right standard, the accurate standard, and, and the, the evidence before the Pollution Control Board just didn't establish liability under that standard. Thank you very much. Thank you, Mr. Rose. Ms. Wonder, thank you also for your arguments here today. The matter will be taken under advisement.